**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) **Criminal Number: 3:20CR61** |
| | ) |
| **RUBEN JAVIER CAC-CHON,** | ) |
| **Defendant.** | ) |
| | ) |
| | ) |

## <u>MOTION TO DISMISS THE INDICTMENT</u>

### Introduction

In April 2020, the Supreme Court relied on historical evidence of a state legislature's racial motives to strike down a criminal law enacted a century earlier. *See Ramos v. Louisiana*, 140 S. Ct. 1390 (2020). Although the law was later reenacted with no evidence of animus, the Court refused to ignore the "racially discriminatory *reasons* that [the state] adopted [its] peculiar rules in the first place." *Id.* at 1401 (emphasis in original). Even the justices' "shared respect for rational and civil discourse" could not "supply an excuse for leaving an uncomfortable past unexamined." *Id*. at 1401 n.44.

Like the law in *Ramos*, the law criminalizing illegal reentry into the United States at 8 U.S.C. § 1326 has an "uncomfortable past" that must be examined. *Id.*  Statements by individual decisionmakers, as the Supreme Court recently held, are within the scope of this inquiry.  *See*

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Com'n*, 138 S.Ct. 1719, 1729-30 (2018).[1]

Enacted at the height of the eugenics movement, the "Undesirable Aliens Act of 1929" was conceived, drafted, and enacted by white supremacists out of a belief that the "Mexican race"[2] would destroy the racial purity of the United States. Legislators referred to Mexicans as "mongrels" and "peons."[3] They claimed Mexicans were "poisoning the American citizen."[4] They sought to keep the country's blood "white and purely Caucasian."[5] They solicited reports and testimony from a eugenicist who likened immigration policy to the "breed[ing] of thoroughbred horses."[6] Not only did this racism underlie the original version of § 1326, the law has disparately impacted Mexicans and other Latin-American individuals in the century since.

Because the facts and historical evidence presented here show that the original illegal reentry law was enacted with a discriminatory purpose, § 1326 is presumptively unconstitutional

---

[1] The standard for showing religious discrimination in violation of the Free Exercise Clause is the same as for racial discrimination under the Equal Protection Clause. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) ("Here, as in equal protection cases, we may determine the city council's object from both direct and circumstantial evidence.") (citing *Arlington Heights*, 429 U.S. at 266).

[2] In the early 20th century, "Mexican" was conceptualized as a race rather than a nationality. For instance, the 1930 census listed "Mexican" as a "Color or Race." United States Census Bureau, *History: 1930*, https://www.census.gov/history/www/through_the_decades/index_of_questions/1930_1.html. And "[f]rom at least 1846 until as recently as 2001 courts throughout the United States have utilized the term 'Mexican race' to describe Latinos." Lupe S. Salinas, *Immigration and Language Rights: The Evolution of Private Racist Attitudes into American Public Law and Policy*, 7 Nev. L.J. 895, 913 (2007).

[3] *See infra* at 8, 10, 11, 12, 13, 17.

[4] *See infra* at 15, 17.

[5] *See infra* at 13.

[6] *See infra* at 13–14.

under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

<div align="center">

**Argument**

</div>

**I.      Legal Framework**

The Fifth Amendment of the Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017).

A law may violate equal protection in three ways. First, a law may discriminate on its face. *See*, *e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967). Second, authorities may apply a facially neutral law in a discriminatory way. *See*, *e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group. *See*, *e.g.*, *Arlington Heights*, 429 U.S. at 265–68. Facially neutral laws which are "discriminatorily motivated" are "just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race." *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016).

Here, Mr. Cac-Chon challenges § 1326 only under the third rationale, so the legal framework of *Arlington Heights* applies. *Arlington Heights* clarified a law is facially invalid where there is "[p]roof of racially discriminatory *intent* or *purpose*" at the time of the law's passage. *Id*. at 265 (emphasis added). Determining whether a purpose was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be

available." *Id.* at 266. *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including:

1)   the impact of the official action and whether it bears more heavily on one race than another;
2)   the historical background of the decision;
3)   the specific sequence of events leading to the challenged action;
4)   the [legislature's] departures from normal procedures or substantive conclusions; and
5)   the relevant legislative or administrative history.

*Arlington Heights*, 429 U.S. at 266–68.

The threshold for satisfying these factors is low. Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265–66. Instead, the challenger need only show "that it was <u>a</u> motivating factor in the decision." *McCrory*, 831 F.3d at 220 (emphasis in original) (quoting *Arlington Heights*, 429 U.S. at 266). The "ultimate question" is whether the legislature "enact[ed] a law 'because of' and not 'in spite of' its discriminatory effect." *Id.* (quotations omitted).

Unlike cases alleging discriminatory *enforcement*, an equal protection claim alleging a discriminatory motive in *enactment* does not require a showing of disparate impact. *Arlington Heights*, 429 U.S. at 265 ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").

Courts have applied *Arlington Heights* to a variety of laws and government actions. One of the first involved a provision in the Alabama constitution that barred voting for any person convicted of a "crime involving moral turpitude." *Hunter*, 471 U.S. at 222. Though neutral on its face, the provision disenfranchised ten times as many Blacks as whites. *Id.* at 227. To prove

discriminatory intent in its passage, challengers submitted transcripts of the 1901 Alabama

constitutional convention where lawmakers had originally enacted the provision, as well as

several historical studies and the testimony of two expert historians. *See id.* at 229. This evidence

showed that "zeal for white supremacy ran rampant" at the 1901 convention and was a

"motivating factor" underlying the voting provision. *Id*. at 229–31. And because the provision

"would not have been adopted by the convention or ratified by the electorate in the absence of

the racially discriminatory motivation," the Supreme Court held that it violated equal protection.

*Id*. at 231; *see also NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016) (invalidating voter

registration restrictions in North Carolina, and observing that "[t]he record is replete with

evidence of instances since the 1980s in which the North Carolina legislature has attempted to

suppress and dilute the voting rights of African Americans"); *Arce v. Douglas*, 793 F.3d 968,

978-81 (9th Cir. 2015) (evaluating challenge to Arizona law shutting down a Mexican-American

Studies program in the Tucson school district, and finding critical in case that legislators had

accused the program of inciting "racial warfare" and supporting a group purportedly claiming

that "North America is a land for the bronze peoples").

      These cases show that courts have used *Arlington Heights* for decades to invalidate facially

neutral laws enacted with a discriminatory intent that have disparately impacted racial groups. As

Mr. Cac-Chon will show, the same animus infected § 1326 to an equal (or even greater) degree.

## II.   Congress Established the Crime of Illegal Reentry with an Unabashed and Explicitly Racist Purpose

      Enacted at the height of the eugenics movement, 8 U.S.C. § 1326 was originally titled the

"Undesirable Aliens Act of 1929."  It was conceived, drafted, and enacted by white supremacists

out of a belief that the "Mexican race"[7] would destroy the racial purity of the United States. Legislators referred to Mexicans as "mongrels" and "peons." They claimed Mexicans were "poisoning" the American citizen. They sought to keep the country's blood "white and purely Caucasian." They solicited reports and testimony from a eugenicist who likened immigration policy to the "breed[ing] of thoroughbred horses."[8]

While not "purporting to be exhaustive," the five *Arlington Heights* factors constitute the "proper inquiry in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S. at 268. And as recent Supreme Court precedent confirms, courts must consider this historical evidence in determining the statute's constitutionality. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1394 (2020) ("Though it's hard to say why these laws persist, their origins are clear. Louisiana first endorsed nonunanimous verdicts for serious crimes at a constitutional convention in 1898. According to one committee chairman, the avowed purpose of that convention was to "establish the supremacy of the white race," and the resulting document included many of the trappings of the Jim Crow era: a poll tax, a combined literacy and property ownership test, and a grandfather clause that in practice exempted white residents from the most onerous of these

---

[7] In the early 20th century, "Mexican" was conceptualized as a race rather than a nationality. For instance, the 1930 census listed "Mexican" as a "Color or Race." United States Census Bureau, *History:                                                                                          1930*, https://www.census.gov/history/www/through_the_decades/index_of_questions/1930_1.html. And "[f]rom at least 1846 until as recently as 2001[,] courts throughout the United States have utilized the term 'Mexican race' to describe Latinos." Lupe S. Salinas, *Immigration and Language Rights: The Evolution of Private Racist Attitudes into American Public Law and Policy*, 7 Nev. L.J. 895, 913 (2007).

[8] Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration, 1924-1965*, at 3 (2020) (quoting Senator David A. Reed).

requirements.").  A close examination of the political context underlying the criminalization of illegal entry in 1929 reveals a disturbing truth: that racism and eugenics were not only a "motivating factor" in the legislature's passage of this law.  *Arlington Heights*, 429 U.S. at 265. They were the primary factor.

A.      "The historical background of the decision."

Historians often refer to the 1920s as the "Tribal Twenties," a time when the Ku Klux Klan strengthened, Jim Crow laws were enacted, and public figures praised eugenics.  World War I had produced "a feverish sentiment against presumably disloyal 'hyphenated Americans,'" and "few could resist the combination of nativism, job scarcity, and anti-Bolshevism that fueled the politics of restriction."[9]  Prominent restrictionists "spoke increasingly of 'racial indigestion,'"[10] and "the 'contamination' of Anglo-American society."[11]  The decade also brought a flood of immigration legislation fueled by fears of "non-white" immigration.[12]  At the start of the decade, Congress passed the first numerical restriction on immigration in the United States.[13]  During the remainder of the decade, legislators aimed for "'America [to] cease to be the 'melting pot.'"[14]  Although the arrival of southern and eastern Europeans in the early 1900s "fueled the rise of American

---

[9] Mae M. Ngai, *Impossible Subjects*, 19, 20 (2004 William Chafe, et al.).
[10] *Id.* at 23.
[11] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol*, 28 (2010).
[12] *See generally* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America* (2019).
[13] Emergency Immigration Act of 1921, Pub. L. 67-5, 42 Stat. 5 (1921).
[14] Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration*, 2020, 3 (2020) (quoting Senator David A. Reed).

manufacturing," nativists saw these groups as "'undesirable immigrants'" who were "socially inferior, culturally alien, and politically suspect."[15]

These fears of non-white immigration were bolstered by the growing acceptance of eugenics—a theory that "captured the imagination of many of America's leading intellectuals."[16] The popular magazine *The Saturday Evening Post* ran articles warning that new immigrants were racially inferior, impossible to assimilate, and a threat to stability and democracy.[17]   The leader of a major scientific institution contended that neither education nor environment could alter the "'profound and inborn racial differences' that rendered certain people inferior."[18]   And states throughout the country were drafting laws "based on this burgeoning race science, including aggressive sterilization programs."[19]

At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of the Eugenics Record Office.[20]   Dr. Laughlin was well known for his model sterilization law that many states and countries, including the Third Reich of Nazi Germany, used as a template.[21]   During the 1920s, Dr. Laughlin testified before Congress multiple times and produced four reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the "individual quality of future population." *See* Ex. A.   Relying heavily on these theories,

---

[15] Hernández, *supra*, at 28.

[16] Yang, *supra*, at 35.

[17] *Id*. at 8.

[18] Okrent, *supra*, at 3.

[19] *Id*. at 38. Those sterilization laws were affirmed in the now infamous decision *Buck v. Bell*, 274 U.S. 200, 207 (1927).

[20] Ngai, *supra*, at 24.

[21]   *Harry Laughlin and Eugenics*, Truman State University. Accessible at https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/.

Congress would anchor its immigration legislation in eugenics and racial inferiority for the remainder of the decade.[22]

###### B.      "The specific sequence of events leading to the challenged action."

 In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable" immigrants—which was often code for non-white.  *See Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 505–06 (9th Cir. 2016) (holding that "the use of 'code words' may demonstrate discriminatory intent").  The first such law was the National Origins Act of 1924, which established quotas based on the national origins of U.S. citizens as reflected in the 1920 census.

The quotas created by the National Origins Act were skewed to keep the nation's "racial strains" predominantly Anglo-Saxon.[23]  The law on its face did not count "nonwhite people residing in the United States" toward the quotas it established.  Indeed, its newly-created "Quota Board" interpreted this provision to exclude all Black people; all East and South Asians (including those who had American citizenship by birth); and all citizens in Hawai'i, Puerto Rico, and Alaska.[24]  Congress and the president accepted these exclusions under pressure to "stand firm against the efforts of 'hyphenates' who would 'play politics with the nation's blood stream.'"[25]  Yet there was a wrinkle in the National Origins Act—it did not set quotas on immigrants from countries in the Western Hemisphere.  This was due to the influence of large agricultural

---

[22] *See* E.P. Hutchinson, *Legislative History of American Immigration Law, 1798-1965*, 212-13 (1981).
[23] Ngai, *supra*, at 24–25.
[24] *Id*. at 26.
[25] *Id*. at 35.

businesses that relied heavily on labor from just over the border.[26]   As one representative complained, there was no chance of capping the number of Mexican immigrants because too many growers were "interested in the importation of these poor peons."  *See* Ex. B.

So despite passing the most sweeping immigration law in years, legislators were not happy. Representative Madden grumbled that the bill "leaves open the doors for perhaps the worst element that comes into the United States—the Mexican peon." [27]  *See* Ex. C. Representative Patrick O'Sullivan criticized the restrictions on Italian immigrants, stating that "the average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a mongrel."  *See* Ex. D. Legislators proposed numerous bills restricting Mexican immigration but none could survive opposition from southwestern growers.  To solve this problem, a group of key figures began to strategize a new type of immigration bill that would approach immigration from a criminal—rather than a civil—angle.

C.      **"The relevant legislative or administrative history."**

After passage of the National Origins Act of 1924, the Department of Labor (which governed the Bureau of Immigration) began implementing Congress's new quota system.[28]  Then-Secretary of Labor James Davis was a strong advocate of Dr. Laughlin and his eugenics theories—even using them as the basis for policies he had developed and published under the title "Selective

---

[26] *See* Hans P. Vought, *The Bully Pulpit*, 179 (2004).
[27] Benjamin Gonzalez O'Brien, Benjamin, Chap. 1, *Handcuffs and Chain Link* (2018).
[28] *See* Vought, *supra*, at 174–79.

Immigration or None."[29]  Davis warned that the "rat type" was coming to the United States, and that these "rat men" would jeopardize the American gene pool.[30]

Secretary Davis was nevertheless torn between his belief in eugenics and his responsibility to maintain a large labor supply for the railroad and agriculture industries.[31]  So together with devout racist Senator Coleman Blease,[32] Davis developed a compromise—Congress would criminalize border crossing after the fact, rather than prevent it in the first place.[33]  That way, they reasoned, authorities could expel Mexicans through a criminal prosecution after the growing season was over, thereby avoiding resistance from businesses that depended on Mexican labor.[34]

Secretary Davis and Senator Blease found two eager collaborators in the House of Representatives, both of whom were on the powerful Immigration and Naturalization Committee. Representative John C. Box from Texas had long characterized the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization."  *See* Ex. D.  In one speech at an immigration conference, Rep. Box had explained that:

> [t]he Mexican peon is a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction but submitted and multiplied as serfs.  Into that was fused much negro slave blood . . . .  The prevention of such

---

[29] *Id.*
[30] *Id.* at 174–75.
[31] *Id.* at 216.
[32] For biographical and historical context about Senator Blease, s*ee* B. Simon, *The appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South*, The Journal of Southern History, 62:1, pp. 57–86 (Feb. 1996), *available at* http://www.jstor.com/stable/2211206.
[33] Ian MacDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica (June 19, 2020), https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy.
[34] *Id.*

mongrelization and the degradation it causes is one of the purposes of our [immigration] laws.

*Id.*  Box believed this importation was "raising a serious race question" because Mexicans were "essentially different from us in character, in social position."  Ex. B at H3619.

Box was joined by the influential Chairman of the House Immigration and Naturalization Committee, Representative Albert Johnson of Washington.  Chairman Johnson—for whom the 1924 "Johnson-Reed" National Origins Act was named—was an "energetic and vehement racist and nativist."[35]  He headed the Eugenics Research Association, a group that opposed interracial marriage and supported forced sterilizations.[36]  He also proudly described his 1924 law as a "bulwark against 'a stream of alien blood, with all its inherited misconceptions respecting the relationships of the governing power to the governed."[37]  Within two years of the 1924 Act, Chairman Johnson turned to legislation that would exclude the "Mexican race," explaining that while the argument for immigration restriction had previously been economic, now "'the fundamental reason for it is biological.'"[38]

Following these legislators' lead, other lawmakers soon "turned to narratives of racial threat to justify restriction."[39]  In February 1928, for instance, Representative Robert A. Green of Florida delivered a speech (read into the congressional record by Representative Lankford) that advocated for Western Hemisphere quotas.  He asserted that countries south of the U.S. are

---

[35] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island*, p. 242–43 (2002).
[36] *Id.*
[37] Roger Daniels, *Guarding the Golden Door*, p. 55 (Hill and Wang, 2004).
[38] Okrent, *supra*, at 3.
[39] Gonzalez O'Brien, *supra*, at Chap. 1 (Kindle edition).

"composed of mixture blood of White, Indian, and negro." *See* Ex. E.  Immigration from these countries, he believed, created a "very great penalty upon the society which assimilates," and put it at a disadvantage to countries that have "kept their blood white and purely Caucasian." *Id.* at H2462.

Chairman Johnson had convened hearings on new immigration legislation.  *See* Ex. F.  At the first hearing, in January 1926, Chairman Johnson admitted into the record a letter from a constituent in El Paso who urged the legislators to keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico."  Ex. F at 30.  In response to this letter, Commissioner General of Immigration Harry Hull stated, "I think he is right."  Ex. F at 30.  Rep. Box added, "I have some letters, Mr. Chairman, just like that."  *Id.*  In April 1926, the same House committee held a hearing entitled, "The Eugenical Aspects of Deportation," where the principle witness was the well-known eugenicist Dr. Laughlin.  *See* Ex. A at 1.  Early in the hearing, Chairman Johnson praised Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and fecundity, describing one as a "priceless" resource that would "bear intimately on immigration policy."  Ex. A at 3.  Dr. Laughlin testified about his latest eugenics report, the goal of which was to "protect American blood from alien contamination."  Ex. A at 3.  When Dr. Laughlin encouraged the committee to conduct future research on the effect of "race crossing within the United States," Chairman Johnson replied that such a study would "be of great use to the committee in its deliberations." Ex. A at 11.

Dr. Laughlin discussed the need for further research into "mate selection" because "whenever two races come in contact there is always race mixture" even though the "upper levels tend to maintain themselves because of the purity of the women of the upper classes."  Ex. A at 19.  The job of any government, Dr. Laughlin explained, was to "demand fit mating and high

fertility from the classes who are better endowed physically, mentally, and morally by heredity." Ex. A at 19.  By deporting or excluding the "lower races" from the country, Dr. Laughlin contended, "[i]mmigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation."  Ex. A at 19.  In response, Chairman Johnson advocated for Congress's use of the "principle of applied eugenics" to "do everything possible" to reduce crime by "debarring and deporting" more people.  Ex. A at 25.  Rep. Box agreed, stating, "we will have to control immigration to suit our own needs or we will lose our national character," which would "spell destruction for the future of America."  Ex. A at 25.

Dr. Laughlin even compared the drafters of deportation laws to "successful breeders of thoroughbred horses," who would never consider "acquiring a mare or a stallion not of the top level" for their "stud farm."  Ex. A at 44.  One such successful breeder he knew "weeds out from the lower levels and recruits by purchase"—a process that is "analogous to immigration in man." Ex. A at 44–45.  "Man is an animal," Dr. Laughlin explained, "and so far as heredity and future generations are concerned, there is considerable real basis for [this] comparison."  Ex. A at 45. When such racial engineering is not possible, Dr. Laughlin warned, deportation of the "undesirable individual" becomes even more critical; otherwise, "we cannot get rid of his blood no matter how inferior it may be, because we cannot deport his offspring born here." Ex. A at 45.  Dr. Laughlin predicted that so long as the nation's borders remained open to immigrants, "there will always be need for deportation, or the 'final selection.'" Ex. A at 44.  In response to this testimony, Chairman Johnson agreed that "[i]mmigration looks more and more like a biological problem, and if the work of this committee results in establishing this principle in our immigration policy we will be well repaid for our efforts."  Ex. A at 46.

Though Chairman Johnson's initial legislation failed, the compromise with the agricultural industry brokered by Secretary Davis and Senator Blease soon made a breakthrough. On January 18, 1929, Senator Blease, on behalf of the Senate Committee on Immigration, submitted a report to the full Senate recommending passage of a law that would penalize "aliens who have been expelled from the United States and who reenter the country unlawfully." Ex. G. This report was accompanied by a letter from Secretary Davis on behalf of the Department of Labor advocating for passage of the law. Ex. G at 2.

The following week, Senator Blease presented this bill on the Senate floor, where he reported that Chairman Johnson had "asked me to get the measures over to the House [within two days] if I possibly could." Ex. H. The full Senate passed the bill with almost no discussion or debate. *See* Ex. H at S2092. Two weeks later, Chairman Johnson submitted a report from the Committee of Immigration and Naturalization to the full House recommending passage of the illegal reentry law. *See* Ex. I.

During debate on the bill, Rep. Thomas L. Blanton complained that Mexicans "come into Texas by hordes" and that "my friend Judge Box has been making a just fight against this situation for years." Ex. B. Rep. Blanton urged the House to "apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there." Ex. B. Rep. Schafer added that "[t]hese Mexicans also come into Wisconsin in droves," and Rep. Blanton challenged others to visit the international ports of entry in Texas to see the "hordes that come across the bridges with no intention of ever going back." Ex. B at H3619. Rep. Fitzgerald then added that from a "moral standpoint," Mexicans were "poisoning the American citizen" because they are "of a class" that is "very undesirable." Ex. B at H3620. Minutes later, the bill

passed the House of Representatives.  Ex. B at H3621.  The president signed it into law three days later.  *See* Ex. K.

This legislative history easily clears the low threshold of showing that racism and eugenics were a "motivating factor" for enacting the law.  Like other *Arlington Heights* cases, passage of the racially-motivated law followed a predictable pattern.  A broad social movement founded on principles of white supremacy and eugenics gained popular support in the 1920s.  *Compare Hunter*, 471 U.S. at 229 (discussing "a movement that swept the post-Reconstruction South to disenfranchise blacks").  Dr. Laughlin, a notorious eugenics "expert," promoted theories of racial inferiority through multiple reports and testimony to Congress.  *Compare McCrory*, 831 F.3d at 225 ("As one of the State's experts conceded [at trial], 'in North Carolina, African-American race is a better predictor for voting Democratic than party registration.'").  Key lawmakers like Chairman Johnson, Senator Blease, and Representative Box (along with Secretary of Labor Davis) promoted these theories and repeatedly endorsed them during legislative sessions. *Compare McCrory*, 831 F.3d at 226 ("The State then elaborated on its justification, explaining that '[c]ounties with Sunday voting in 2014 were disproportionately black' and 'disproportionately Democratic.'  In response, SL 2013–381 did away with one of the two days of Sunday voting. Thus, in what comes as close to a smoking gun as we are likely to see in modern times, the State's very justification for a challenged statute hinges explicitly on race—specifically its concern that African Americans, who had overwhelmingly voted for Democrats, had too much access to the franchise.") (citations omitted); *Arce*, 793 F.3d at 978–79 (legislators accused ethnic studies program of inciting "racial warfare").  Other legislators expressed similar sentiments.  *See id.*  And even Congressmen who might not have otherwise endorsed racially motivated legislation were consistently advised of the "inferiority" of the "Mexican race" during legislative sessions in the

five years leading up to the law's passage. *Compare Democratic National Committee v. Hobbs*, 948 F.3d 989, 1041 (9th Cir. 2020) (finding that "good faith belief" of "sincere legislators" did not shield law from discriminatory, motivating factor under the "cat's paw"[40] doctrine—where others convinced these legislators to act based on others' discriminatory motives); *Staub v. Proctor Hosp.*, 562 U.S. 411, 419-20 (2011) (adopting "cat's paw" doctrine). In other words, the evidence of racial discrimination in the legislative history and events leading up to the passage of the 1929 law easily meets—and seemingly readily exceeds—the evidence in other *Arlington Heights* cases where race was found to be a "motivating factor."

    **D.**    **"The legislature's departures from normal procedures or substantive conclusions."**

Examining the fourth *Arlington Heights* factor—whether a decisionmaker departs from "normal procedures or substantive conclusions"—requires courts to consider the timing of the enactment of a law that could signal a discriminatory intent. *See Arlington Heights*, 429 U.S. at 268 ("For example, if the property involved here always had been zoned R-5 but suddenly was changed to R-3 when the town learned of MHDC's plans to erect integrated housing, we would have a far different case."). Courts may also consider illogical or counter-intuitive conclusions in the decision-making process. *See City of Yuma*, 818 F.3d at 507 (citing the city's decision to "disregard the zoning advice of its own experts"). Here, not only do the overtly racist statements

---

[40] The "cat's paw" doctrine is "based on the fable, often attributed to Aesop, in which a clever monkey induces a cat to use its paws to take chestnuts off of hot coals for the benefit of the monkey." *Id*. at 1040.

of legislators during the law's passage show its discriminatory purpose, several irregularities and illogical conclusions in the passage of the 1929 law also implicate this factor.

First, the 1920s was the first and only era in which Congress openly relied on the now-discredited theory of eugenics to enact immigration legislation.   Both the 1924 and 1929 immigration laws drew heavily on Dr. Laughlin's debunked beliefs that immigration control was a matter of racial engineering, akin to horse breeding.   And while Congress ultimately acknowledged the discriminatory origins of the National Origins Act of 1924 and repealed it in 1965,[41] illegal reentry remains one of the few laws still in effect from that era.

Second, the racial vitriol expressed during the debates was directed almost exclusively at Mexicans—even though Canadians were also entering the United States in record numbers.  *See* Ex. B at H3621 (stating that 81,506 Canadians entered the United States in 1928).  If the 1929 Act were motivated by generalized xenophobia or economic anxiety, rather than racism, one would expect legislators to criticize foreigners across the board.  But no legislator referred to Canadians as "mongrels"; none complained of "hordes" of Canadians crossing the border; none objected that Canadians were "poisoning the American citizen."   And a representative from Wisconsin complained only about Mexicans taking jobs, not Canadians.  *See* Ex. B at H3619. These irregularities show that not only was Congress's passage of the Undesirable Aliens Act based on

---

[41] *See* Immigration and Nationality Act of 1965, Pub. L. 89–236 (abolishing the National Origins Formula); Gabriel J. Chin, *The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965*, 75 N.C. L. Rev. 273, 301 (1996) (noting Congress' "racial egalitarian motivation" for repealing the National Origins Act).

eugenics and racism, it also departed from typical substantive conclusions underlying immigration law.

### E.   "The impact of the official action and whether it bears more heavily on one race than another."

Within a year of the 1929 law's passage, the government had prosecuted 7,001 border crossing crimes; by 1939, that number rose to over 44,000.[42]   In each of these years, individuals from Mexico comprised no fewer than 84% of those convicted, and often made up as many as 99% of defendants.[43]   And the number of prosecutions has soared—the number of § 1326 cases has risen over the past three years by nearly 40% to 22,077—making illegal reentry one of the most common felony federal crimes today.[44]   The United States Sentencing Commission reported that in 2019, "99.0% of illegal reentry offenders were Hispanic, 0.7% were White, 0.3% were Black, and almost none were Other races."[45]   Nearly a century after its enactment, the crime of illegal reentry is being prosecuted in exactly the way that the legislators in the 1920s intended it to be used—to punish and remove Latinos from the United States.

* * * * *

---

[42] *Annual Report of the Attorney General of the United States for the Fiscal Year 1939*, 37; Kelly Lytle Hernández, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965*, n.6 at 138–39 (UNC Press, 2017).

[43] Hernández, *supra* n.5, at 138–39 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years, 1931–36).

[44] *See* United States Sentencing Commission, *Quick Facts: Illegal Reentry Offenses*, Fiscal Year 2019, *available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf.

[45] *Id.*

In sum, applying the five *Arlington Heights* factors shows that racism and eugenics were, at minimum, a "motivating factor" in the passage of the Undesirable Aliens Act.  Because Mr. Cac-Chon has shown a discriminatory purpose underlying § 1326, the burden shifts to the government to show that the Undesirable Aliens Act of 1929 would have passed "even had the impermissible purpose not been considered."  *Arlington Heights*, 429 U.S. at 266–68, 270 n.21. *See also Hunter*, 471 U.S. at 228 (shifting the burden to the law's defenders to "demonstrate that the law would have been enacted without this factor").  The Court should thus provide the government an opportunity to make this showing; if it declines to do so, the Court should dismiss the charge.

If, however, the government submits evidence showing that the 1929 law would have been enacted without a discriminatory purpose (or if the Court believes that Mr. Cac-Chon has not yet shown a discriminatory purpose), Mr. Cac-Chon will present additional evidence at an evidentiary hearing on this motion.  Courts frequently hold evidentiary hearings and trials to hear evidence on the *Arlington Heights* factors.  *See e.g., Hunter*, 471 U.S. at 229 (relying on evidence at trial of state legislative proceedings, "several historical studies, and the testimony of two expert historians"); *McCrory*, 831 F.3d at 234.  Indeed, the Supreme Court has found error where a lower court granted summary judgment "without an evidentiary hearing" on a legislature's disputed motives under *Arlington Heights*.  *See Hunt v. Cromartie*, 526 U.S. 541, 545 (1999).

<div style="margin-left:40%">

Respectfully Submitted,
Ruben Javier Cac-Chon.

By:      /s/
           Counsel

Joseph S. Camden
Va. Bar No. 92143
Assistant Federal Public Defender

</div>

Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0830
Fax (804) 648-5033
joseph_camden@fd.org